Howard Kleinhendler
Julian D. Schreibman
WACHTEL & MASYR, LLP
1 Dag Hammarskjold Plaza
885 Second Avenue
New York, New York 10017
Tel. (212) 909-9500
Fax  (212) 909-9417

*Attorneys for Plaintiff*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SAND

---

CREDIT CARD PROCESSING USA, INC.
d/b/a MSI MERCHANT SERVICES, INC.,

          Plaintiff,

     v.

MERRICK BANK CORPORATION and
CARDWORKS, INC.

          Defendants.

Civ. Action No. **10 CIV 7464**

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff Credit Card Processing USA, Inc., d/b/a MSI Merchant Services, Inc. ("MSI")

by and through its attorneys, Wachtel & Masyr, LLP, as and for its Complaint, respectfully

alleges:

## NATURE OF THE ACTION

1.      This lawsuit arises out of the serial misconduct of defendant Merrick Bank

Corporation ("Merrick"), accomplished in part with its parent corporation defendant CardWorks

Inc. ("CardWorks").   From 2005 through 2009, through negligence, multiple breaches of

contract, and tortious interference with business relations, the defendants inflicted damages on MSI in an amount exceeding approximately $60 million.

2.      In June 2005, Visa and MasterCard announced the discovery of a massive security breach at a credit card processing company called CardSystems Solutions, Inc. ("CSSI"). CSSI had retained magnetic stripe data from tens of millions of credit cards on its computer systems in blatant violation of Visa and MasterCard rules, as well as well-known and fundamental security protocols. Not only was this data wrongly stored, it was stored on inadequately protected computer systems. For a period of several months, criminals had ready access to the information retained by CSSI. Ultimately, the complete data for more than 40 million individual credit cards was compromised. The stolen data was used to manufacture counterfeit credit cards and banks were compelled to re-issue millions of cards to protect against potential fraud. The CSSI security failure was so significant it generated a Congressional investigation into credit card data security.

3.      At the time CSSI exposed tens of millions of consumers to fraud, it was acting as the agent of defendant Merrick, without whose sponsorship CSSI would have been prohibited from processing Visa and MasterCard transactions. As CSSI's sponsor, Merrick promised to ensure that CSSI complied with Visa and MasterCard's security requirements. It wholly and completely failed to do so, thereby enabling CSSI's extraordinary security failure for which Merrick is directly liable.

4.      The CSSI/Merrick security breach was devastating to plaintiff MSI. MSI is in the business of recruiting and providing services to merchants so that they may conduct credit card transactions. MSI had performed these services under contract with Provident Bank since 2001; but, in 2004, Provident assigned the MSI contract to Merrick. Thus, at the time of the

2

CSSI/Merrick security breach, credit card transactions for MSI's tens of thousands of merchants were being processed by CSSI as Merrick's agent. Because of the enormous disruption caused by efforts to fix the mess caused by CSSI and Merrick, thousands of merchants abandoned MSI, never to return, and MSI's efforts to recruit sales agents were substantially impaired. Despite Herculean efforts to protect and rebuild its business, which alone cost MSI in excess of $1 million in out of pocket expenses, MSI has suffered business losses totaling at least $55.5 million through 2009.

5.     Through the Visa and MasterCard system, Merrick was promptly held liable, as CSSI's sponsor, for tens of millions of dollars in losses incurred by the banks that had issued the compromised cards, but was permitted to pay just a fraction of the total losses in exchange for rapid resolution of claims through a Visa and MasterCard-sponsored alternative dispute resolution process. In addition, Visa and MasterCard made a formal finding of negligence against Merrick and imposed a fine of approximately $600,000 on top of the loss liability.

6.     To avoid financial liability for losses caused by its negligent supervision of CSSI, Merrick and its corporate parent CardWorks embarked on a scheme to force MSI, an innocent victim of the CSSI/Merrick security fiasco, to bear the cost of Merrick's misconduct, despite the enormous damage MSI had incurred as a result of Merrick's negligence.

7.     MSI's services had proved very lucrative to Merrick and, unfortunately, this made MSI an attractive target for Merrick's malfeasance, even though *none* of the losses caused by the Merrick/CSSI security breach were remotely attributable to MSI or its network of merchants. To carry out their scheme to unlawfully refill Merrick's coffers with MSI's money, the defendants resorted to extortion – coercing MSI to maintain its relationship with Merrick – and ultimately

outright theft of $4,219,623.75 from MSI.  Merrick's unlawful seizure of this sum added insult to the crippling injuries already inflicted on MSI as a result of the CSSI/Merrick security failure.

8.      Furthermore, the defendants interfered with MSI's efforts to terminate its relationship with Merrick and enter into a contract with a new bank.  Merrick refused to abide by its obligation to cooperate in the transfer of MSI's merchants to a new bank unless MSI agreed to pay $7.2 million to Merrick, to which Merrick was not entitled.  MSI refused this extortionate demand and as a result was forced, to its detriment, to remain contractually shackled to Merrick for another year.  Meanwhile, MSI's continuing relationship with Merrick was a financial boon to Merrick.

9.      By this lawsuit, MSI seeks indemnification and damages based on negligence, interference with economic relations, breaches of agreements, conversion, and unjust enrichment.

## THE PARTIES

10.      Plaintiff MSI is a company incorporated under the laws of the State of New Jersey having its principal place of business in New Providence, New Jersey.  MSI is a well-established, highly successful, registered Independent Sales Organization ("ISO"), founded in 1989, that provides certain credit card processing services to merchants that accept payment by credit cards. The role of an ISO like MSI is to develop new merchant relationships on behalf of a bank with which it is affiliated.  MSI's business activities support hundreds of jobs in the New York metropolitan area and nationwide.

11.      Defendant Merrick is a company incorporated under the laws of the State of Utah having its principal place of business in South Jordan, Utah.  Merrick was founded, on information and belief, in 1997.  Although legally entitled to call itself a bank, Merrick does not

have brick-and-mortar branches nor does it service typical consumer accounts or transactions. Rather, it is engaged principally in the business of issuing credit cards targeted at the sub-prime market[1] and in making loans for the purchase of recreational vehicles and boats. On the acquiring side, Merrick has been described as the largest US processor of credit cards used to purchase Internet pornography.[2]

12.     Defendant CardWorks is a company incorporated under the laws of the State of New York having its principal place of business in Woodbury, New York. On information and belief, CardWorks was formed for the purpose of serving as the parent company of defendant Merrick and Merrick's sister company CardWorks Services, which holds itself out as the largest privately held provider of outsourcing support services for bankcard-related products to clients in the United States and Canada.

## JURISDICTION AND VENUE

13.     This court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

14.     Venue lies in this district pursuant to 28 U.S.C. § 1391(a)(3) because defendant Merrick has consented to personal jurisdiction in this District and because Section 13 of the TSA (defined below), the breach of which gives rise to the fourth cause of action, requires that any action brought against Merrick by MSI be litigated exclusively in a court located in New York County, New York.

---

[1]     Such cards are often not in fact "credit cards," but rather secured cards for which the consumer must deposit in advance an amount of money equal to the "credit" limit of the card.

[2]     *Internet Porn Gets a New Banker*, FORBES, Sep. 27, 2004.

## FACTUAL ALLEGATIONS

### Merrick Entrusts CSSI With Its Credit Card Processing Operations

15.     There are generally four parties involved in a Visa or MasterCard credit card transaction: (1) the cardholder; (2) the issuing bank; (3) the merchant; and (4) the acquiring bank. The cardholder uses a credit card provided by his or her issuing bank to purchase goods and services from merchants. The merchant's bank – the acquiring bank – pays the merchant and is then reimbursed by the issuing bank, which bills the cardholder's account. Rather than performing all of their credit card processing duties themselves, acquiring banks often contract with a credit card processor ("CCP") to process the credit card payments when a cardholder makes a purchase. CSSI served as a CCP under contract with Merrick.

16.     Merrick is a member of the Visa and MasterCard International Card Associations (the "Associations") and operates as both an issuing and acquiring bank. In or around July, 2004, Merrick contracted with CSSI to perform credit card processing duties for Merrick. However, CSSI was not a member of the Associations. Therefore, Merrick was required to sponsor CSSI to enable CSSI to process credit transactions on the Visa and MasterCard systems. As CSSI's sponsor, Merrick had an iron grip on CSSI's ability to operate. Without sponsorship into the Visa and MasterCard networks, CSSI's business would grind to a halt.

17.     Under its contract with Merrick, CSSI was obligated to comply with all security rules imposed by MasterCard and Visa. These rules are extensive and detailed. They explicitly prohibit the storage of data encoded in the magnetic-stripe of individual credit cards (which includes the cardholder's name and account number) on computer systems used for processing transactions.

18.     In turn, as CSSI's sponsor, Merrick was responsible for, *inter alia*: (1) ensuring CSSI's full and actual compliance with all of Visa and/or MasterCard's security rules and regulations; (2) ensuring CSSI's proper and secure processing of credit card transactions; and (3) undertaking *full* financial responsibility for *all* claims, losses or costs caused by CSSI's acts or omissions, *irrespective of fault*.  Indeed, as Merrick itself acknowledged in a lawsuit it later filed against CSSI:

> [A] member bank that sponsors a processor such as CSSI is responsible for the processor's proper performance under the Association rules and undertakes *full* financial responsibility, *irrespective of fault*, for *all* losses or costs incurred by the Association or its members that are attributable to acts or omissions of the sponsored processor.  The Association rules also provide for the imposition of penalties or fines on a member for violations of the Association rules by a sponsored third-party processor – whose acts or omissions are imputed to the sponsoring member.[3]

## Merrick and CSSI Cause Millions of Cardholders to be Victimized

19.     On June 17, 2005, MasterCard disclosed that there had been a major data breach at CSSI (the "Data Breach").  An investigation of the Data Breach confirmed that nearly four months earlier, criminals had stolen magnetic-stripe data that had been wrongly retained for months on CSSI's computer systems.  The investigation concluded that the Data Breach was caused by CSSI's abject failure to comply with industry security rules and regulations.  Specifically, CSSI failed to properly secure the data it held and wrongfully retained magnetic-stripe data in its systems for extended time periods in violation of Visa and MasterCard rules.  Magnetic stripe data contains more than just the account number and can be used by criminals to fabricate counterfeit cards.

---

[3] *Merrick Bank Corp. v. CardSystems Solutions Inc.*, No. 06-00173 (WMN) (D.Md.), Complaint ¶ 12 (emphasis added).

20.     The magnetic stripe data for approximately *40 million* credit and debit card numbers was compromised.  The breach was so significant that it generated a Congressional investigation into the security of credit card data, with a hearing on July 21, 2005 before the Subcommittee on Oversight and Investigations of the House Financial Services Committee.  At that hearing, Visa USA's Executive Vice President of Operations and Risk Management stated: "CSSI, by its own admission, knowingly and improperly retained magnetic stripe information that can be used to help create counterfeit cards.  This action by CSSI was a clear violation of [Visa's Cardholder Information Security Program]."  David Watson, Chairman of Merrick Bank, testified at the same hearing that CSSI "retained certain transaction data on their system in clear violation of [Visa and MasterCard] rules."  Finally, John Perry, CSSI's President and CEO, stated: "[W]e truly regret this occurrence of data theft.  We have repeatedly acknowledged our error, and are committed to making sure it does not happen again."  Perry noted that *Merrick was CSSI's sponsoring bank.*

## Merrick is Held Responsible for the Data Breach But Minimizes Its Financial Accountability

21.     Because of the wide-ranging impact of the security breach and the number of potential claims by issuing banks against CSSI and its sponsor, Merrick, Visa and MasterCard established an alternative dispute resolution process.  By participating in this process, issuing banks obtained quick determinations and payments of their losses; in return, issuing banks agreed to accept a discounted amount for their losses, resulting in a significant financial benefit to Merrick.  Merrick agreed to participate in this process and ultimately was required to pay only approximately $10 million in damages to issuing banks.  This represented a substantial discount from the tens of millions of dollars of actual losses as calculated by Visa and MasterCard.  For example, on information and belief, with respect to Visa, Merrick was obligated to repay only

approximately $4 million of an actual loss total of approximately $19 million. On information and belief, payments to MasterCard issuers totaled approximately $5.7 million. Meanwhile, on information and belief, Merrick itself had suffered very few, if any, direct losses as a result of the breach; the monies it paid out were to make whole the losses suffered by issuing banks as a result of CSSI/Merrick's negligence.

22.     The losses suffered by issuing banks derived almost entirely from the cost of enhanced monitoring of accounts and the reissuance of millions cards. Indeed, according to CSSI's President, as of his July 21, 2005 Congressional testimony, "out of all the account numbers that may have been affected," CSSI had "not been notified of any that [had] been used fraudulently."

23.     On information and belief, one of the chief purposes of the alternative dispute resolution process was to resolve claims by issuing banks against those actually responsible and avoid those costs being passed on to others, including specifically merchants.

24.     Visa and MasterCard also formally determined that Merrick acted negligently in connection with its sponsorship of CSSI because Merrick failed to ensure that CSSI complied with industry security rules. Based on this finding that Merrick's negligence led to the Data Breach, Visa and MasterCard assessed penalties and fines against Merrick, above and beyond the damages it paid, in excess of $600,000.

## The CSSI/Merrick Data Breach Causes Severe Harm to MSI

25.     MSI was a victim of the CSSI/Merrick Data Breach.

26.     MSI served as an ISO to Merrick Bank under an Independent Sales Organization Agreement (the "ISO Agreement") that MSI had originally entered into with Provident Bank on April 30, 2001. On September 13, 2004, Provident Bank assigned the ISO Agreement to

Merrick. (A copy of the ISO Agreement as assigned to Merrick Bank is attached hereto as Exhibit A). MSI served as one of approximately 29 ISOs under contract with Merrick in connection with Merrick's operations as an acquiring bank.

27.     The role of an ISO such as MSI is to recruit and enroll qualified merchants into an acquiring bank's merchant program. The ISO assists the merchant in completing required documentation, provides the merchant with equipment and services, trains the merchant on the rules and procedures for joining the merchant program and handles the day-to-day management of the merchant program for the acquiring bank. The acquiring bank charges each merchant a fee for its services and the ISO is compensated by receiving a portion of that fee. As a result, the acquiring bank typically has total control over the ISO's cash flow.

28.     Because CSSI was Merrick's credit card processor, MSI's network of nearly 50,000 merchants were compelled to use CSSI to process their credit card payments. Following the Data Breach, Visa and MasterCard terminated CSSI's ability to serve as a CCP, requiring all ISOs to develop plans to migrate their merchants to another processor within a very narrow time-frame. Although CSSI was permitted to continue operating for a few months to avoid a complete collapse of ISOs tied to their system, MSI was not permitted to add new merchants to the system during this period. Visa and MasterCard also mandated changes to CSSI's operations which in turn required changes in how MSI's merchants interfaced with the CSSI system.

29.     Thus, in the summer and fall of 2005, MSI was compelled to devote not only all of its existing institutional resources to managing the fallout from the Data Breach, it was forced to hire an army of temporary workers to accomplish the Herculean task of fixing the interface with the failed CSSI system. Then, CSSI's assets were purchased in December 2005 (discussed below), requiring further expensive transition efforts. MSI's out of pocket costs to deal with the

Data Breach, including the hiring of many temporary workers and greatly increased administrative expenses, totaled approximately $1 million.

30.    As a direct result of the Data Breach and the disruptive nature of the multi-faceted transition processes, *several thousand* MSI merchant clients terminated their relationship with MSI.

31.    Furthermore, for a period of several months after the Data Breach, MSI was unable to grow its network at all due to (i) the short-term outright prohibition on recruiting new merchants and (ii) the need to devote all corporate energies to keeping as much of its existing portfolio of customers as possible and transitioning them into a new system. Therefore, MSI was unable to recruit new sales representatives who in turn would be responsible for bringing in new merchants. Sales agents are the life blood of a company like MSI; MSI's success in the industry has been based upon its successful recruitment of new, talented sales representatives. In the year following the Data Breach, MSI's recruitment of new sales representatives each month was about 70% lower than it had been prior to the Data Breach. The loss of these sales agents led to the recruitment of approximately 4,800 fewer new merchant accounts in the year following the Data Breach.

32.    Thus, as a direct result of the Data Breach, MSI suffered substantial damages including: (a) the loss of more than approximately 10% of its total existing client merchants, over and above typical attrition; (b) the loss of new clients over a multi-month period; (c) direct costs of transitioning merchants to a new system, including assistance with training and installation of new software and hardware; and (d) the labor and administrative costs of hiring numerous temporary workers whose sole responsibility was to help with the migration of merchants out of the old CSSI system. These damages total in excess of an estimated $55.5 million.

11

33.     MSI would not have incurred any of these damages but for the CSSI/Merrick Data Breach.

34.     MSI's damages were a direct and foreseeable consequence of Merrick's negligent supervision of its agent's compliance with basic security protocols and unambiguous rules.

35.     Merrick is responsible for these damages, totaling more than $55.5 million, under its common law duties to MSI.

36.     Merrick is also responsible for compensating MSI not only for these expenses, but also MSI's attorneys' fees, under the indemnification clause of the ISO Agreement. Specifically, Section VII of the ISO Agreement requires Merrick to indemnify MSI for, *inter alia*, all damages and expenses, including attorneys' fees, that MSI sustains or incurs "as a result of any negligence, wrongful acts, misrepresentations or misconduct" by Merrick.

37.     Merrick has failed to indemnify MSI as required by the ISO Agreement.

**Merrick and CardWork's Scheme to Force MSI to Pay for the Data Breach**

38.     Merrick not only failed to make MSI whole for the tremendous damage it caused, it embarked on a scheme to evade financial responsibility for its own massive failure of oversight. The scheme began by forcing MSI – an innocent victim of Merrick's own misconduct – to continue working with Merrick and culminated in or about December 2008 with the theft of $4,219,623.75 of MSI's money. Along the way, Merrick, in conjunction with its parent CardWorks, breached the ISO Agreement and tortiously interfered with MSI's relationship with a new acquiring bank. Although the defendants' efforts took different forms and involved several bad acts, the scheme centered around a wrongful effort to first improperly increase and then steal money that MSI was required to maintain in a so-called Reserve Account at Merrick.

39.     The ISO Agreement required MSI to establish and maintain the Reserve Account at Merrick.  The Reserve Account contained funds set aside by Merrick from the fees due to MSI for the services it provided under the ISO Agreement.  Merrick had complete control over the flow of funds into the Reserve Account.

40.     The Reserve Account existed for the *sole purpose* of protecting Merrick against certain defined types of losses *attributable to the merchants recruited by MSI.*  Such losses are referred to in the ISO Agreement as "Merchant Losses," also known as "chargebacks."

41.     The Reserve Account is established pursuant to Section 2.2 of the ISO Agreement which states (emphasis added):

> Merchant Losses.     All Merchant Losses (Chargebacks) incurred by [Merrick] for any reason, *unless such loss is proximately caused by the negligence of [Merrick],* will be borne by MSI.
>
> A.     Reserve Account.  MSI will establish a Reserve Account to fund the payment of transaction charge backs[.]
>
> B.     Chargeback Collection.  In the event a Chargeback is incurred which is *not* collected from a Merchant, [Merrick] will collect such amount from MSI from the following sources: 1) first, [Merrick] will set off against the Transfer Account, and if the Transfer Account is not sufficient to reimburse [Merrick], then 2) [Merrick] will notify MSI in writing, and MSI will remit the shortfall to [Merrick] within 60 days of receipt of such notice, and then 3) [Merrick] is authorized to debit any remaining     shortfall from the Reserve Account.  *Money may be deducted from the Reserve Account  only for the payment of Merchant Chargebacks.*  [Merrick] will promptly notify MSI of any deductions from the Reserve Account, along with a Statement detailing the reason for the deduction.

42.     Many of the terms in this section are specifically defined by the ISO Agreement.  In particular, "merchant" means "a business that has entered into a Merchant Agreement and to which MSI provides services under [the ISO Agreement]."  A "Merchant Loss" is defined as "any loss incurred by [Merrick] for any reason *attributable to a Merchant*, including but not

limited to losses due to the fraudulent practices of a Merchant and uncollected Merchant fees" (emphasis added). Although clearly defined in the ISO Agreement, these terms are also widely used and understood in the credit card industry; the definitions set forth in the ISO Agreement are consistent with the universal understanding of these terms.

43.     The scope and meaning of the Reserve Account provisions are clear and unambiguous.  Pursuant to this Section, Merrick could make a deduction from the Reserve Account only if it (1) suffered Merchant Losses, also known as "chargebacks," that (2) Merrick was unable to collect from the responsible MSI-affiliated merchant.  In no event, however, could the Reserve Account be used to pay for Merchant Losses that were proximately caused by Merrick's negligence.  Thus, Merrick could *not* deduct funds from the Reserve Account to cover losses unless three conditions were met: (1) the loss must have been attributable to an MSI merchant; (2) the other designated sources of recovery must have failed to cover the loss; and (3) the Merchant Loss must not have been proximately caused by Merrick's own negligence.  In any instance when Merrick sought to tap the Reserve Account to cover a Merchant Loss, it was obligated to provide a detailed statement justifying the deduction.  Although the funds in the Reserve Account belonged to MSI, it had no access to, or control over them.

44.     Beginning in the fall of 2005 and continuing through its seizure of the entire Reserve Account in approximately December 2008, Merrick pretended that the monies it had paid out as a result of the Data Breach – including not only compensation to issuing banks, but the fines imposed by the Association, and the legal fees it incurred as a result of the Data Breach – were actually chargebacks attributable to MSI's merchants.  Throughout this period, Merrick knew that its claim was wrong and wholly meritless.

### Merrick's Data Breach Expenses Were Not Merchant Losses
### Under the ISO Agreement

45.     As explained by the definitions in the ISO Agreement and the commonly understood meaning of the terms, *a chargeback occurs as a result of a disputed consumer transaction with a merchant.*

46.     The reason for the losses caused by the Data Breach were determined immediately after the Data Breach was disclosed and had nothing to do with any merchant (much less *MSI's* merchants) but rather was solely the result of CSSI and Merrick's negligence. As noted above, pursuant to CSSI's Congressional testimony, CSSI acknowledged being unaware of any fraudulent transactions conducted with the compromised account information, suggesting a total absence of actual consumer transactions using stolen account information.

47.     Furthermore, following the initial investigation, the Visa and MasterCard claims process conclusively established that the Data Breach costs were not merchant losses and were, in any event, the result of Merrick's negligence.

48.     Indeed, in order to receive compensation through the Association-sponsored dispute resolution process, issuing banks had to *agree in writing* that merchants were not liable for their losses.  Specifically, to participate in the dispute resolution process, each and every claimant seeking payment from Merrick was required to sign a certification that stated, among other things, that "*no chargeback rights exist* or have been successfully exercised on any of the disputed transactions for which we are seeking reimbursement through this claim."[4]  To suggest otherwise stands the entire dispute process on its head.  As explained by Visa's Executive Vice President in his July 21, 2005 Congressional testimony, liability for issuing banks for fraudulent

---

[4]     *See Cumis Insurance Society, Inc. v. Merrick Bank Corp.*, 680 F.Supp.2d 1077, 1081 (D.Az. 2010) (emphasis added).  In the *Cumis* lawsuit, Merrick invoked and relied upon these certifications, which also contain a release from future liability, as a central part of its defense. *See, e.g.,* 680 F.Supp. 2d at 1086-87.

transactions is a feature of a system that avoids placing responsibility on merchants unless the merchant itself engages in misconduct.

49.     Merrick itself has acknowledged that the monies it paid as part of the dispute resolution process were not caused by or attributable to merchants and therefore are not "merchant losses." In a lawsuit against CSSI, Merrick expressly alleged:

> In the Visa system, an issuing bank that bears the cost of a fraudulent transaction can, under certain circumstances, recover that cost from another Visa member. In a case such as this, where the credit-card fraud *is caused by a processor's security compromise*, the issuing bank can recover the loss from the acquiring bank or banks that sponsored the processor for the compromise.[5]

Nowhere in its allegations does Merrick *ever* state or even suggest that the amounts it was required to pay to issuing banks were caused by, or could be recovered from, merchants. Instead, according to Merrick, the massive losses incurred by issuing banks and paid by Merrick "*directly result[ed] from CSSI's security breach.*"[6] Therefore, Merrick alone, as CSSI's sponsor, is liable.

50.     Even if the Data Breach consisted in part of chargebacks – which it did not – nothing in the ISO Agreement defines Merchant Losses to include ancillary costs such as attorney fees or fines imposed on Merrick for Merrick's own negligence.

51.     In fact, the fine imposed on Merrick as CSSI's sponsor by the Association for Merrick's negligent failure to ensure CSSI's compliance with industry security rules foreclosed any Merrick recourse to the Reserve Account even if its expenses had been Merchant Losses because the ISO Agreement prohibits debiting that Account where the loss was proximately caused by Merrick's negligence. Indeed, this negligence provision complements Merrick's own admission in court filings that as CSSI's sponsor it undertook "full financial responsibility" for

---

[5] *Merrick Bank Corp. v. CardSystems Solutions Inc., supra,* Complaint ¶ 34 (emphasis added; footnote omitted).

[6] *Id.*, ¶ 1 (emphasis in original).

CSSI's failure to comply with Association rules – a position utterly at odds with its efforts to pass off these expenses onto an innocent party like MSI.

## Merrick Breaches the ISO Agreement

52.     Despite the fact that the Data Breach had nothing to do with chargebacks, the defendants plotted first to increase the funds in the Reserve Account and then take the money by pretending that the losses caused by CSSI and Merrick were actually caused by MSI's merchants. Merrick's purported claim to the Reserve Account was implausible on its face. The monies spent by Merrick as a result of the CSSI Data Breach were not "merchant losses" within the meaning of the ISO Agreement because they were not attributable to any of MSI's merchants. Even if they had been merchant losses, Merrick's own negligence would have precluded recourse to the Reserve Account. Thus, the defendants knew that Merrick's claim on the Reserve Account was fanciful and had no rational basis in fact.

53.     Despite knowing full well that MSI's merchants, and therefore the funds in the Reserve Account, had nothing to do with the Data Breach, Merrick and Cardworks quickly implemented plans to maximize and then steal that money under the guise of compensation for "chargebacks."

54.     The defendants' first step in their multi-year scheme was to inflate the amount of money in the Reserve Account which had been fixed, by agreement of the parties, at $500,000 for years. The ISO Agreement provided a formula according to which the Reserve Account was initially funded.   Specifically, the ISO Agreement (Section 2.2) provided for an initial contribution of fifty thousand dollars ($50,000) followed by contributions "at the rate of five (5) basis points (.0005) multiplied by the dollar volume of Visa or MasterCard sales drafts processed by Merchants until the Reserve Account equals the amount calculated in accordance with the

Reserve Cap Funding Formula ("Reserve Amount"). Thereafter, the Reserve Account shall be funded as necessary to maintain the Reserve Amount."

55.     In or about the middle of 2002, early in its relationship with MSI, Provident had waived application of this formula and instead agreed with MSI to set and maintain the Reserve Amount at $500,000. Merrick assumed and continued to abide by this agreement when it was assigned the ISO Agreement in 2004. The Reserve Amount remained at $500,000 pursuant to this agreement between the parties until the CSSI/Merrick Data Breach.

56.     In September 2005, Merrick contrived to terminate its sponsorship of another ISO, United Bank Card ("UBC"), which worked closely with MSI. In the spring of 2005, before the Data Breach, Merrick's Senior Vice President Fred Horn had prepared a letter of reference in which he described UBC as "by far the most professional and experienced" of Merrick's ISOs, noting that UBC brought in both the most and the highest quality of new merchant applications, while maintaining "one of the highest retention rates in the industry." Thus, the proposed termination of UBC just a few months later was entirely unjustified, but initiated in order to exert pressure on MSI with respect to the Reserve Account.

57.     UBC's business was integral to MSI as they cooperated in multiple areas of business development. As the defendants well knew, because of its youth and size, UBC was unlikely to be able to promptly find a new sponsoring bank if it was terminated by Merrick. Without new sponsorship UBC could fail and in turn potentially cripple MSI. Thus, threatening UBC gave Merrick added leverage over MSI.

58.     The defendants did not disguise their naked coercion of MSI. In a letter to MSI's President dated September 26, 2005, Merrick offered to extend its relationship with UBC for a period of months on the condition that MSI consent to an amendment of the ISO Agreement that

would have permitted Merrick to raise the Reserve Amount immediately and *without limit.* As written, the ISO Agreement permitted the Reserve Amount to be changed only in relation to the volume of transactions performed. Not satisfied with this, Merrick wrote (emphasis added), that the extension of UBC was contingent upon "[t]he amendment of MSI's Independent Sales Organization Agreement with Merrick *to remove the language that establishes the Reserve Amount*." Merrick unashamedly stated: "Merrick plans to increase MSI's reserve to an amount necessary to cover its share of the estimated exposure to losses resulting from the security breach at CSSI, for which MSI has agreed to indemnify Merrick."

59.     As Merrick well-knew when it transmitted this extortionate threat, MSI had not agreed to indemnify Merrick for any CSSI-related losses. As set forth in the crystal clear language of the ISO Agreement discussed above, the Reserve Account could only be used for losses attributable to MSI's merchants. Meanwhile, by accepting "full financial responsibility" for CSSI's non-compliance with security regimens as CSSI's sponsor, Merrick was essentially promising that other innocent parties within the Visa and Mastercard systems would *not* suffer as a result of CSSI's misconduct.

60.     Thus, despite knowing that the Data Breach had absolutely nothing to do with any "merchant loss" or "chargebacks," Merrick boldly demanded that MSI agree to give Merrick carte blanche to pillage its income stream so that MSI, an innocent party, could suffer the full brunt of paying for CSSI's misconduct while Merrick, a guilty party, would be made whole.

61.     Under threat of litigation, Merrick backed away from its demand to change the language of the ISO Agreement, but went forward full-steam ahead with its plan to improperly maximize the value of the Reserve Account. To do this, Merrick breached its agreement under the modified ISO Agreement to hold the Reserve Amount at $500,000 and instead applied the

Reserve Amount formula that Merrick previously waived.  In a September 29, 2005 letter to MSI's President, Merrick wrote:

> Merrick plans to increase MSI's reserve to the lesser of (i) an amount necessary to cover all of its estimated obligations, including its indemnification and fraud-related obligations relating to the security breach at CSSI, or (ii) the Reserve Amount set forth in MSI's Independent Sales Organization Agreement.

There is nothing in the ISO Agreement that would authorize increasing the Reserve Account to pay for anything other than chargebacks.

62.    Subsequently, Merrick calculated that the Reserve Account should contain $2,505,971.68, rather than the agreed upon $500,000. Pursuant to an October 3, 2005 notice to MSI, Merrick transferred $668,235.73 each month for three months to reach the new Reserve Amount. Merrick's actions in diverting these funds constituted a breach of the ISO Agreement.

63.    Confirming CardWorks' role in this plot, this October 3, 2005 communication was copied to Don Berman, who is identified on the letter as "CEO CardWorks." (A media report from this period indicates that the management of the two entities was closely intertwined.)[7]

64.    Even if its application of the Reserve Amount formula had been permissible in the abstract, Merrick was not permitted to raise the Reserve Amount for any purpose, but only to cover chargebacks, and only at a rate commensurate with increases in transaction volume. Raising the Reserve Amount in an effort to reduce Merrick's own out-of-pockets arising out of CSSI's Data Breach was clearly an improper purpose, unauthorized by the ISO Agreement.

65.    By letter dated October 3, 2005 and in other communications, MSI's counsel explained to Merrick in excruciating detail why the Reserve Account could not be increased nor

---

[7] "Christoperh Steele, the attorney for Ranierie & Co. [a part owner of CardWorks], would only say that Merrick's affairs are 'handled much more from CardWorks perspective.'" *Internet Porn Gets a New Banker, supra.*

debited by Merrick for anything whatsoever to do with the Data Breach. Merrick refused to listen to reason and persisted in its scheme.

66.     Although Merrick had not yet actually stolen MSI's money, by diverting MSI's funds into an account over which MSI had no control, Merrick forced MSI to absorb additional losses while it was still recovering from the direct impact of the Data Breach.

### Merrick and CardWorks Force MSI to Work With Merrick

67.     In order to continue growing the amount in the Reserve Account and to benefit from association with MSI, Merrick and CardWorks also coerced MSI to continue working with Merrick.

68.     One key benefit to Merrick of continuing this relationship was to keep MSI's merchant network on CSSI's books while the remnants of that company were sold. Merrick had sought to recoup its expenses from the Data Breach under indemnification provisions that ran from CSSI to Merrick. But, having been terminated by Visa and MasterCard, CSSI had no future prospects and its indemnification was essentially worthless. Thus, Merrick demanded that CSSI find a buyer for its business. Merrick then planned to capture a portion of the sales revenue to cover its own expenses. Merrick had complete control over CSSI's attempt to sell itself because without Merrick's agreement to sponsor the purchaser of CSSI's assets, no buyer would step forward.

69.     At the time of the CSSI/Merrick Data Breach, MSI had nearly 50,000 merchants operating on the CSSI network. MSI's merchant base comprised nearly half of CSSI's business. If MSI left Merrick and established a relationship with a new bank and CCP, the sales value of CSSI would decline precipitously. Thus, in order to maximize CSSI's sales value and thus its own recovery, Merrick had to insure that MSI kept its business with CSSI.

70.     Merrick's coercion worked, garnering millions of dollars for its coffers. On or about December 5, 2005, PayByTouch, Inc. ("PBT") purchased CSSI for $47 million. As part of the purchase, CSSI set aside $15 million to pay for losses incurred by Merrick as a result of the Data Breach. Of those funds, $6.4 million was placed in escrow with J.P Morgan Chase Bank. Visa and MasterCard approved of the CSSI asset transfer and permitted merchants to process transactions through PBT, which was sponsored by Merrick. Thus, despite the fact Merrick had been directly responsible for the Data Breach through its failure to supervise CSSI, which led to a nearly unprecedented security breach, Merrick had now successfully maintained control of MSI's merchant client base and had procured millions of dollars to cover its costs. (Later, on or about April 3, 2008, Merrick closed the loop on its selfish, self-promoting scheme. PBT, whose monies largely compensated Merrick for its CSSI losses, had been forced into bankruptcy. Merrick then bought PBT's card processing unit, reportedly for a paltry $2 million, and operated that business under the name CardWorks Processing as a subsidiary of Merrick. On information and belief, the son of the CEO of Merrick's parent CardWorks' was installed as the head of CardWorks Processing.)

71.     During 2006, MSI looked for a way to escape from Merrick. In January 2007, MSI notified Merrick that it intended to terminate the ISO Agreement and transfer all of its accounts to a new acquiring bank, First National Bank of Omaha (FNBO). Under the terms of the ISO Agreement, Merrick was obligated to facilitate the transfer of these accounts. In blatant violation of its obligations and intending to interfere with MSI's proposed contractual relationship with FNBO, Merrick refused to cooperate with the transfer unless and until MSI paid Merrick $7.2 million – an amount Merrick claimed represented what MSI owed it for CSSI losses. Merrick conveyed this demand by letter dated January 27, 2007, from Fred Horn who

again knowingly lied about the nature of the CSSI/Merrick security breach losses, claiming that "the vast majority of these losses were paid to the Associations to reimburse issuers for chargebacks and merchant losses." Of course, this was false. At the time this statement was made, Merrick knew that the issuers that had received compensation from Merrick had certified that their losses were *not* chargebacks or merchant losses. Moreover, the defendants knew that MSI's merchants were not at fault. Horn's untruthful statement was even belied by a chart he attached to his letter purporting to calculate MSI's pro-rated "share" of the losses. The three-line summary chart in no way demonstrated that *any* losses were attributable to any merchant conduct – much less conduct by *MSI's merchants* – and instead revealed that Merrick was seeking to pass on not only reimbursements to card issuers for the cost of issuing new cards, but also the fines assessed for its own negligence and its own legal bills. Indeed, the summary chart identifies all of its MasterCard-related payments as comprising the costs of reissuing cards, monitoring accounts, fines and Merrick's own legal expenses. Consistent with the fact that few if any of the compromised numbers were actually used to make purchases, fraudulent transactions are not mentioned. Because Merrick had no right or justification to make such a demand, MSI refused. But, without Merrick's cooperation, MSI was unable to move forward with its transfer to FNBO.

72.     Upon information and belief, Horn was acting at the direction of the leadership not only of Merrick but defendant CardWorks, including its CEO Donald Berman. Notably in an e-mail dated January 26, 2007, from Horn to MSI executive George Mayo in New Jersey, Horn stated that discussions concerning MSI's response to the $7.2 million extortionate demand would have to be reviewed with his "5 chiefs" which, upon information and belief, included Berman.

73.     Faced with no choice but to work with Merrick, MSI used Merrick as its sole acquiring bank until December 31, 2007 when Merrick itself terminated the ISO Agreement.

MSI was damaged by being forced to be associated with Merrick during this period.  All the while, Merrick continued to improperly deduct funds from MSI's income and place them in the Reserve Account under its exclusive control.

**Merrick Steals the Reserve Account**

74.     Throughout 2007, Merrick continued to divert the maximum amount possible to the Reserve Account, over the continuing objection of MSI.  The Reserve Account ballooned to more than $4 million.

75.     On December 31, 2007, Merrick terminated the ISO Agreement.  Termination required Merrick to return "all funds in the Reserve Account" to MSI within 180 days after the final transaction was processed by Merrick. (ISO Agreement § 8.4).

76.     Merrick did not return the funds in the Reserve Account to MSI.

77.     On June 2, 2008, MSI, Merrick and FNBO entered into a Merchant Portfolio Assignment, Assumption and Transition Services Agreement (the "TSA") which provided that Merrick transfer all of its MSI merchant agreements and merchant reserve accounts to FNBO and that during this transition period, Merrick would continue to service MSI's merchant accounts.  (A copy of the TSA is attached hereto as Exhibit B).

78.     During the negotiation of the TSA, MSI continued to object to Merrick's claim that its Reserve Account funds could be used to cover any payments made by Merrick arising out of the Data Breach.

79.     The TSA explicitly provided that the terms of the ISO Agreement concerning the permitted disposition of the Reserve Account were unchanged and incorporated in *toto* into the TSA.

80.     Merrick did not return any of the Reserve Account funds and on December 30, 2008, Merrick formally advised MSI that it had "applied the entirety of the Reserve Account ($4,219,623.75) to partially satisfy MSI's current obligations under the Agreements to repay Merrick Bank for the losses it has suffered to date related to the 2005 data security breach at [CSSI]."

81.     Merrick's theft of the Reserve Account funds to cover its CSSI-related expenses was improper and a breach of both the ISO Agreement and TSA because MSI had no "obligations" to give Merrick money to cover payments made by Merrick to the Associations in satisfaction of other banks' losses.

82.     Furthermore, Section 2.2 permits debiting of the Reserve Account only for chargebacks "which [are] not collected from a Merchant." If Merrick truly believed its losses were merchant losses, its first obligation was to seek repayment from merchants which, on information and belief, it has never done, because there were no "merchant losses." Merrick's failure to do so further reveals its knowledge that its act was nothing more than theft.

83.     On information and belief, Merrick also did not seek payments from all of its approximately 29 ISOs as its "theory" of the loss would have mandated.

84.     Merrick also never provided the contractually required detailed statement justifying the amount taken from the Reserve Account nor did its seizure of MSI's money take into account the millions of dollars Merrick had already accumulated through the sale of CSSI's assets. Specifically, Merrick maintained that MSI was responsible for approximately 50% of Merrick's costs based on the entirely irrelevant fact that MSI's merchants account for approximately 50% of the transaction volume for Merrick's acquiring business. Even if this was a relevant calculation, Merrick's bad faith is blatantly revealed by the fact that at the time it

seized $4,219,623.75 from MSI (as a "partial" payment of MSI's alleged obligations), Merrick had already reduced its out of pocket costs to issuing-banks to well-below $8 million through its litigation against CSSI and the millions of dollars set aside for Merrick in the Pay-By-Touch transaction, including $6.4 million placed in escrow for its benefit. In addition, Merrick wrongly included its own legal fees and the fines it had been compelled to pay in the total of the sums it claimed it was due. Thus, Merrick's "calculations" were entirely divorced from reality and did not reflect any true effort to pro-rate its outlays, further evidencing that its seizure of the money was made in bad faith and not based on any actual claim to those funds.

85.     Merrick was obligated – through its contract with the Associations sponsoring CSSI, through its contract with MSI, and through its common law duties – to protect MSI and other innocent victims from its agent's misconduct. Instead, Merrick chose to victimize MSI. In sum, Merrick, through its own negligence, caused MSI to suffer millions of dollars in damages; Merrick and CardWorks then tortiously interfered with MSI's business relations to force MSI to continue doing business with Merrick. Merrick then breached its obligations to MSI under the ISO Agreement and TSA culminating in Merrick's theft of the entire contents of the Reserve Account.

## FIRST CLAIM FOR RELIEF
### (Indemnification – against Merrick)

86.     Plaintiff repeats and realleges paragraphs 1-85.

87.     Pursuant to Section VII of the ISO Agreement, Merrick agreed to indemnify MSI for, *inter alia*, all damages and expenses, including attorneys' fees, that MSI sustained or incurred "as a result of any negligence, wrongful acts, misrepresentations or misconduct" by Merrick.

88.     Merrick had an unequivocal duty to insure that CSSI complied with the Associations' security rules.  Merrick negligently failed to require CSSI to adhere to those rules, thus leading directly to the Data Breach.  Merrick was even fined by the Associations for its total failure to ensure CSSI's compliance.  Accordingly, Merrick's failure falls squarely within the ambit of "any negligence, wrongful acts . . . or misconduct."  As a direct and forseeable result of the massive Data Breach, MSI incurred damages including from the cost of migrating its merchants to a new system; lost business; lost business opportunities; and legal fees, in a total amount to be determined at trial, but not less than $55.5 million.

89.     Merrick has refused to acknowledge its indemnity liability and has not compensated MSI for its losses.

### SECOND CLAIM FOR RELIEF
**(Negligence – Merrick)**

90.     Plaintiff repeats and realleges paragraphs 1-89.

91.     Merrick was negligent in its supervision of CSSI and was formally found to be negligent by the Associations.  Specifically, Merrick failed to ensure that CSSI abided by the explicit security protocols of the Associations.  As the Association member specifically charged with ensuring CSSI's security compliance, Merrick's negligence was a direct cause of the CSSI/Merrick security breach.  Merrick's negligence was confirmed by the fines levied against it by Visa and MasterCard.

92.     In turn, CSSI was negligent in its failure to abide by the Association's security protocols when it retained magnetic-stripe data on its computer system and then exposed that data to criminals.

93.     CSSI itself, and Merrick, through its sponsorship and required supervisory role over CSSI, had complete control of the data processing information that ran through CSSI's CCP system and were solely in a position to comply with the Visa and MasterCard security protocols concerning retention of customer information.  By virtue of this superior position, which was integral to MSI's operations, CSSI and Merrick owed a duty to MSI to conduct their operations with reasonable care.  The total failure to do so led directly to MSI's harm.  Merrick is legally responsible for the negligence of its agent, CSSI, toward MSI.

94.     The losses suffered by MSI were the direct and foreseeable consequence of Merrick's negligence.

95.     MSI's losses were incurred in New Jersey, the only state in which it maintains a place of business.

96.     MSI's damages include the cost of migrating its merchants to a new system, including the cost of hiring temporary staff for an extended period; lost business; lost business opportunities; in a total amount to be determined at trial, but not less than $55.5 million.

### THIRD CLAIM FOR RELIEF
#### (Breach of Contract – Merrick)

97.     Plaintiff repeats and realleges paragraphs 1-96.

98.     MSI fully performed its obligations under the ISO Agreement.

99.     When executed in 2001, the ISO Agreement contained a formula according to which the amount of money required to be maintained in the Reserve Account would be calculated.

100.    In 2002, MSI and Provident modified the ISO Agreement to permanently set the Reserve Amount at $500,000.  Pursuant to this modification, the Reserve Account contained a

constant $500,000 amount over the subsequent two years despite the steady growth of MSI's business with Provident.

101.    This contract modification was not abrogated or altered by the assignment of the ISO Agreement from Provident to Merrick in September 2004.

102.    Consistent with this agreement, Merrick maintained the Reserve Account at $500,000 for the first year of its relationship with MSI.

103.    Following the Data Breach, Merrick breached the amended ISO Agreement by unilaterally insisting on application of the Reserve Amount formula contained in the original ISO Agreement.

104.    Although MSI objected and did not consent to this modification, because Merrick exercised total control over MSI's income stream MSI could not stop Merrick from diverting additional funds to the Reserve Account.

105.    As a result of Merrick's misconduct, beginning in or about October 2005 and continuing through in or about December 2008, fees properly due to MSI under the ISO Agreement were instead withheld from MSI and placed in the Reserve Account.

106.    MSI was unable to utilize these diverted funds for business purposes, further damaging MSI during a period when it had already suffered significant losses as a result of the Data Breach.   Every dollar that was wrongfully diverted constituted income that should have been paid to MSI and thereby deprived MSI of its bargained for benefit under the ISO Agreement.   MSI has been damaged in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract – Merrick)

107.    Plaintiff repeats and realleges paragraphs 1-106.

108.    MSI has fully performed all of its obligations under the ISO and TSA.

109. Under the ISO Agreement, Merrick was only entitled to use the Reserve Account funds to recover a "Merchant Loss" as defined in the ISO Agreement where such loss was not occasioned by Merrick's own negligence. These terms were explicitly incorporated into the TSA.

110. Merrick breached the TSA when it improperly applied the Reserve Account funds to cover its CSSI-related expenses.

111. None of the losses incurred by any party as a result of the security breach were attributable to any merchant, much less *MSI's merchants* as required under the agreement; rather the losses were caused by the security breach at CSSI and consisted chiefly of the costs of reissuing credit cards.

112. Nothing in the Reserve Account provisions permits Merrick to debit the Reserve Account for anything other than "merchant losses," such that under no circumstances could Merrick use those funds to compensate itself for expenses such as legal fees and fines paid to the Associations, though this is explicitly what Merrick did.

113. As reflected by the findings of liability against Merrick in the dispute resolution process, as well as the fines instituted by Visa and MasterCard, Merrick's expenditures are the direct result of its own negligence and therefore, regardless of the nature of the loss, Merrick is prohibited from taking money from the Reserve Account.

114. Thus, Merrick's conduct breached the Reserve Account because its Data Breach expenses were not "Merchant Losses" and were caused by Merrick's own negligence.

115. Merrick's seizure of all funds in the Reserve Account was wrongful and in breach of unambiguous contractual provisions. As a result of Merrick's breaches of the ISO and

TSA, MSI has been damaged in an amount to be determined at trial, but not less than $4,219,623.75.

### FIFTH CLAIM FOR RELIEF
#### (Conversion – Merrick)

116.     Plaintiff repeats and realleges paragraphs 1-115.

117.     Merrick was only entitled to use the Reserve Account funds to recover "Merchant Loss" as defined in the ISO Agreement where such loss was not occasioned by Merrick's own negligence.

118.     Merrick had no right to convert these funds to its own use.  None of the losses from the Data Breach were "Merchant Losses."  Nevertheless, on or about December 20, 2008, Merrick invaded the Reserve Account and improperly converted $4,219,623.75 of MSI's funds to its own use.

119.     MSI repeatedly demanded that Merrick return the funds, but Merrick has refused.

120.     As a result of Merrick's conduct, MSI has been damaged in an amount to be determined at trial, but not less than $4,219,623.75 million.

121.     Plaintiff suffered damages in New Jersey where its business is located.

122.     Merrick's conduct was willful and contumacious and was intended to inflict substantial harm upon MSI.   Accordingly, the Court should award punitive damages in an amount to be determined at trial, but not less than $10 million.

## SIXTH CLAIM FOR RELIEF
### (Unjust Enrichment – Merrick)

123.    Plaintiff repeats and realleges paragraphs 1-122.

124.    On December 30, 2008, Merrick improperly seized and converted $4,219,623.75 of MSI's funds for its own use.

125.    Merrick provided no service or other consideration for these funds and will be unjustly enriched if it is allowed to keep this money.

126.    Merrick must disgorge these ill-gotten gains and return the funds in their entirety to MSI.

## SEVENTH CLAIM FOR RELIEF
### (Tortious Interference With Prospective Economic Relations – Both Defendants)

127.    Plaintiff repeats and realleges paragraphs 1-126.

128.    Merrick was obligated under the ISO Agreement to cooperate with the transfer of MSI's merchant accounts to another acquiring bank.  Specifically, Section VIII of the ISO Agreement provides that "upon termination for any reason, [Merrick] will fully cooperate in assigning the Merchant Agreements to another Visa/MasterCard member as elected by MSI."

129.    Upon being informed that MSI proposed to terminate the ISO Agreement according to its terms in January 2007 and transfer its merchants to FNBO, Merrick and CardWorks used wrongful means to prevent MSI from entering into the contract with FNBO.

130.    Specifically, as described above, in January 2007, the defendants demanded the payment of more than $7 million, to which they knew Merrick was not entitled, in exchange for Merrick's cooperation with the transfer.  Tellingly, the defendants did not demand the payment if MSI agreed to continue its relationship with Merrick.  As revealed in an e-mail from Merrick's

Senior Vice-President, the corporate leadership of defendant CardWorks was involved in this plot.

131.    One year later, Merrick itself terminated the ISO Agreement finally freeing MSI to pursue a relationship with FNBO, which it did.  As a result of the delay in consummating its relationship with FNBO, MSI was damaged by lost business and lost business opportunities in an amount to be determined at trial, but reasonably believed to be not less than $1 million.

132.    The defendants' conduct was directed at MSI in New Jersey and MSI suffered damages in New Jersey, the only state in which MSI maintains an office.

133.    The defendants' conduct was willful and contumacious and was intended to inflict substantial harm upon MSI.  Accordingly, the Court should award punitive damages in an amount to be determined at trial, but not less than $10 million.

WHEREFORE, MSI requests that the Court enter judgment in its favor and against Merrick as follows:

(i)     On the first cause of action, damages against Merrick in an amount to be determined at trial, but not less than $55.5 million, plus interest, attorneys' fees and costs, as provided by contract and/or permitted by law;

(ii)    On the second cause of action, damages against Merrick in an amount to be determined at trial, but not less than $55.5 million plus interest and costs;

(iii)   On the third cause of action, damages against Merrick in an amount to be determined at trial, plus interest and costs;

(iv)    On the fourth cause of action, damages against Merrick in an amount to be determined at trial, but not less than $4,219,623.75, plus interest and costs;

(v)     On the fifth cause of action, damages against Merrick in an amount to be determined at trial, but not less than $4,219,623.75 plus interest and costs, plus punitive damages in an amount to be determined at trial, but not less than $10 million;

(vi)    On the sixth cause of action, damages against Merrick in an amount to be determined at trial, but not less than $ 4,219,623.75 plus interest and costs; and

(vii)   On the seventh cause of action, damages against Merrick and CardWorks in an amount to be determined at trial, but not less than $1,000,000 plus interest and costs, plus punitive damages in an amount to be determined at trial, but not less than $10 million; and

(viii)  For such further relief as the court deems just and proper.

## JURY DEMAND

Plainitff demands a trial by jury.

Dated: September 28, 2010

WACHTEL & MASYR, LLP

Howard Kleinhendler (HK  5712)
Julian D. Schreibman (JS 1124)
1 Dag Hammarskjold Plaza
885 Second Avenue
New York, New York 10017
(212) 909-9500
Fax (212) 909-9417
hkleinhendler@wmllp.com
jschreibman@wmllp.com

*Attorneys for Plaintiff*